**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LANISA ALEXANDER, | ) | CASE NO. 1:20-cv-01549 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| *Acting Comm'r of Soc. Sec.*, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Lanisa Alexander (Plaintiff), challenges the final decision of Defendant Kilolo

Kijakazi, Acting Commissioner of Social Security (Commissioner),[1] denying her applications

for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II

and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. (Act). This court has

jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States

Magistrate Judge pursuant to consent of the parties. (R. 10). For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

### I. Procedural History

On June 1, 2018, Plaintiff filed her applications for DIB and SSI, alleging a disability onset

date of March 25, 2015. (R. 9, Transcript (Tr.) 265-276). The application was denied initially

and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge

---

[1] Pursuant to Rule 25(d), the previous "officer's successor is automatically substituted as a party."
Fed.R.Civ.P. 25(d).

(ALJ). (Tr. 180-209). Plaintiff participated in the hearing on September 16, 2019, was

represented by counsel, and testified. (Tr. 58-85). A vocational expert (VE) also participated and

testified. *Id*. On November 4, 2019, the ALJ found Plaintiff not disabled.[2] (Tr. 30). On June 15,

2020, the Appeals Council denied Plaintiff's request to review the ALJ's decision, and the ALJ's

decision became the Commissioner's final decision. (Tr. 1-6). Plaintiff's complaint challenges

the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R.

14 & 16).

Plaintiff asserts the following assignments of error: (1) substantial evidence supports further

limitations than what was determined by the ALJ in assessing Plaintiff's residual functional

capacity (RFC); (2) the ALJ erred in finding that the opinions of nurse Murphy and Dr. Suelzer

were not persuasive; and (3) the ALJ failed to perform a proper pain analysis. (R. 14).

## II. Evidence

### A. Relevant Medical Evidence

#### 1.  Treatment Records

##### a. Physical Impairments[3]

On January 15, 2018, Plaintiff was seen by podiatrist Debra Thornton, DPM. (Tr. 435). She

complained of itchy, dry skin on both feet, as well as numbness and tingling. *Id*. She admitted

that the pain cream she uses for neuropathy is helping. *Id*. On objective examination, the

---

[2]  A previous application for DIB and SSI was denied by an ALJ on November 20, 2017. (Tr. 99). That application was filed on June 8, 2015, alleging an onset date of January 1, 2013. (Tr. 89).

[3]  The recitation of the evidence is not intended to be exhaustive and focuses in greatest detail on the mental health treatment of Plaintiff from nurse practitioner Erin Murphy, as it relates to her second assignment of error.

provider noted the following: Plaintiff ambulated unassisted in boots, no open lesions, no erythema, and the skin on her lower leg and feet appeared diffusely xerotic bilaterally. *Id*. She had a hyperkeratotic lesion "on the right lateral heel and sub 5th met" bilaterally, positive Tinel sign, negative Babinski test bilaterally, and slight tingling/numbness upon light touch bilaterally. *Id*. Protective sensation was intact at 10/10 pedal sites. *Id*. Muscle strength was 5/5 for all pedal groups and ankle joints had full range of motion (ROM) without pain or crepitus. *Id*. Dr. Thornton assessed diabetes mellitus with associated neuropathy, skin xerosis, onychomycosis/nail anomaly, and callous right heel. *Id*. Similar findings were noted on subsequent visits to Dr. Thornton in May of 2018, July of 2018, and February of 2019. (Tr. 427, 1089, 1384).

On May 10, 2018, Plaintiff saw Frederick Wilson, D.O., and fellow Tara Swim, M.D., for a chief complaint of low back pain. (Tr. 423-427). She had no pain in her legs and no focal weakness; aggravating factors included walking/standing, bending, twisting, and lifting. (Tr. 423). On physical exam, Plaintiff was 5'2" tall and weighed 189 pounds; she had a normal gait including heel/toe walking, but some difficulty with tandem gait; full 5/5 strength in all areas of the lower extremities; and neurosensory within normal limits. (Tr. 426). The primary encounter diagnosis was lumbar spondylosis. *Id*.

On June 7, 2018, Plaintiff was seen by Leann Olansky, M.D., and fellow Vicente San Martin, M.D., for a follow-up concerning her Type II diabetes mellitus. (Tr. 811). On physical examination, it was noted that Plaintiff was obese, in no acute distress, and had normal strength and reflexes with no tremor. (Tr. 815). In the extremities, she had "no edema, no cyanosis and normal nails." *Id*. She was assessed with Type II diabetes mellitus complicated by neuropathy and "controlled on current regime." (Tr. 816).

3

On July 25, 2018, Plaintiff was seen by rheumatologist Howard Smith, M.D., who assessed bilateral chronic knee pain that is stable, noting diffuse osteoarthritis of the hands and knees. (Tr. 1091). He recommended continuing with conservative measures and prescribed physical therapy for her knee and occupational therapy for her hands. He prescribed acetaminophen. *Id*. He stressed the need for Plaintiff to lose weight to help with her arthritis. *Id*. On musculoskeletal examination, there was "[m]ild tenderness of the hands, CMC joints and knees [w]ith no swelling erythema, effusions. Otherwise, there is no other joint or muscle tenderness, with no swelling …" (Tr. 1093). Her gait was mildly antalgic, and she had no cyanosis, clubbing, or crepitus in the extremities. *Id*.

On August 15, 2018, an x-ray of Plaintiff's left shoulder revealed marked narrowing of the acromioclavicular (AC) joint and calcification in the soft tissues along the greater tuberosity of the humerus that was "probably due to a previous calcific tendinitis of the supraspinatus tendon." (Tr. 938). No fractures or dislocations were observed. *Id*.

On September 27, 2018, Plaintiff was seen by Paul Saluan, M.D., for evaluation of her left shoulder and elbow after falling in July of 2018. (Tr. 1220-1221). He explained that x-rays of her left shoulder "reveal no evidence of bony abnormalities," but x-rays of the left elbow "reveal the possibility of a radial head fracture that is healed. Difficult to ascertain." (Tr. 1222).

On May 2, 2019, x-rays of Plaintiff's knees revealed "moderate to severe" bilateral medial joint space narrowing with joint spaces otherwise maintained. (Tr. 1436). There was mild osteophytosis in the right knee, and moderate osteophytosis in the left. *Id*. There was no erosion or joint effusion in either knee. *Id*. The impression was moderate to severe bilateral medial compartment osteoarthritis. (Tr. 1435). X-rays of Plaintiff's hands on the same day revealed osteoarthritis bilaterally with advanced findings at the base of the left thumb. (Tr. 1436).

4

On the same date, Plaintiff was seen by rheumatologist Sournya Chatterjee, M.D., for a consultative opinion regarding osteoarthritis of knees and hands. (Tr. 1416). She noted Plaintiff had been treated with Naproxen and Gabapentin for her knees, and Voltaren gel for the base of her thumbs, and noted that Plaintiff had never received steroid injections in the knees. *Id*. On review of symptoms, Plaintiff had no morning stiffness, muscle weakness, muscle pain/tenderness, joint pain, or joint swelling. (Tr. 1417). Neurologically, Dr. Chatterjee also noted no sensitivity or pain in the hands or feet. *Id*. As for psychiatric symptoms, she noted "[n]o history of excessive worries, anxiety, depression, agitation, panic attacks." *Id*. On physical examination, Plaintiff had tenderness over the first carpometacarpal joints of the thumbs, and painful range of motion with crepitus in the knees, but no clinical synovitis. (Tr. 1422). Neurologically, her gait was normal, sensation was grossly intact, and her reflexes were normal and symmetric. *Id*. She assessed osteoarthritis of the hands and knees. *Id*.

### b. Mental Impairments

On November 1, 2017, Plaintiff was seen by Erin Murphy, CNP. (Tr. 406-407). Plaintiff was assessed with PTSD [post-traumatic stress disorder] and MDD [major depressive disorder]. (Tr. 407). Nurse Murphy's assessment stated that Plaintiff reported being depressed due to not feeling well, but she had a coherent, linear, and more positive outlook, and was more tolerant of stressors. *Id*.

On January 2, 2018, Plaintiff reported to nurse Murphy that she was feeling down because she was living with her brother who made rules for her, her SSI was denied, and cold air was affecting her asthma. (Tr. 402). She reported isolating more, low motivation and energy, and rated her depression 10/10 for the past two weeks. *Id*. She reported that she would receive legal custody of her niece's baby by March. *Id*. She reported that she graduated from high school with

no special education classes and worked in a day care center and in home health care for twelve years. (Tr. 403). No side effects were reported with medications. *Id*. Nurse Murphy increased the dosage of Lexapro for depression and anxiety and advised over-the-counter Melatonin for sleep. (Tr. 404). No mental status examination was noted for the visit. (Tr. 402-404).

On March 1, 2018, Plaintiff was seen by Jornelle Tucker, QMHS-B, and presented in a positive mood despite reporting that she felt like she was being taken advantage of by family members. (Tr. 1290).

On April 3, 2018, Plaintiff presented to the Emergency Department with complaints of left ear pain, wheezing, and shortness of breath. (Tr. 428). On psychiatric review, Plaintiff had a normal mood and affect, normal speech and behavior, and normal cognition and memory. (Tr. 430).

On July 24, 2018, Plaintiff reported feeling tired and overwhelmed due to a new move and obtaining full custody of her niece. (Tr. 1323). She had been out of Abilify for a month; and noted her medication helps with irritability, and depression was slightly improved with medication. (Tr. 1323-1324). Plaintiff reported that she could not focus enough to finish a book. *Id*. Nurse Murphy noted that Plaintiff was making some progress towards pharmacological management of ISP goals and objectives and had no PTSD symptoms. *Id*. Plaintiff's prescriptions for Lexapro and Abilify were continued unchanged, and she was started on Trazodone for sleep, as she could not afford Melatonin. (Tr. 1324).

On August 14, 2018, Plaintiff reported to nurse Murphy that her anxiety was higher than her depression the prior day, possibly due to seeing a consultative psychologist the previous week. (Tr. 1318). She reported that she did not sleep well the previous night, but that it was rare that she does not sleep well. *Id*. It was again noted that Plaintiff was making some progress

6

towards pharmacological management of ISP goals and objectives. (Tr. 1319). Plaintiff reported that her anxiety is tolerable, and situation related. *Id*. She was diagnosed with PTSD in remission and major depressive disorder. *Id*. Her medications were continued unchanged. *Id*.

On September 11, 2018, Plaintiff reported being tired due to caring for her one-year-old grandchild. (Tr. 1314). She rated her depression 8/10 and consistent anxiety. She reported not sleeping well but was taking Trazodone only once per week. *Id*. It was again noted that Plaintiff was making some progress towards pharmacological management of ISP goals and objectives. (Tr. 1315). She was diagnosed with PTSD in remission and major depressive disorder. *Id*. Her medications were continued unchanged, except for an increase of Abilify from 3mg to 5mg. (Tr. 1316).

On December 14, 2018, Plaintiff presented depressed and with poor motivation, reportedly overwhelmed by stressors. (Tr. 1351). On mental status examination, Plaintiff had appropriate appearance, generally good overall health, "generally relaxed and engaged, cooperative" behavior and manner, restricted affect, sad mood, depressive thought content, appropriate insight/judgment, grossly intact memory, and average intellect. (Tr. 1351; Exh. 15F:3). Plaintiff was switched from Abilify to Vistaril, and Lexapro was continued unchanged. *Id*.

On February 6, 2019, Plaintiff told nurse Murphy she was still having financial stressors and not sleeping well after staying up to watch TV or play games on her phone. (Tr. 1353). She also reported recent panic attacks lasting a few minutes. *Id*. Her past psychiatric medications included Zoloft, Wellbutrin, Abilify, and Lexapro, all of which Plaintiff reported were ineffective or she did not like. *Id*. On mental status examination, Plaintiff had appropriate appearance, generally good overall health, "generally relaxed and engaged, cooperative" behavior and manner, restricted affect, her reported mood was sad, depressive thought content,

appropriate insight/judgment, grossly intact memory, and average intellect. (Tr. 1354; Exh. 15F:6). The diagnoses included moderate episode of major depressive disorder and generalized anxiety disorder, for which she prescribed Hydroxyzine, Trazodone, and Venlafaxine. *Id*. Nurse Murphy completed a checkbox-style Medical Source Statement that same day, the contents of which are set forth below. (Tr. 1347-1348).

On February 20, 2019, Plaintiff reported no side effects or difficulty with the transition in her medications. (Tr. 1359). Plaintiff stated that her mood was "so-so," and she was having panic attacks "but not that often." *Id*. On mental status examination, Plaintiff again had appropriate appearance, generally good overall health, "generally relaxed and engaged, cooperative" behavior and manner, restricted affect, her reported mood was sad, depressive thought content, appropriate insight/judgment, grossly intact memory, and average intellect. (Tr. 1360). Plaintiff's Venlafaxine was continued and the transition from Lexapro to Effexor was continued. (Tr. 1361).

On April 10, 2019, Plaintiff was seen by nurse Murphy, who noted Plaintiff missed an appointment last month. (Tr. 1368). Plaintiff stated that her sleep was "so-so," and reported "a depressive episode" that lasted a week. *Id*. She reported that she was going to start school in May to study early childhood education. She wanted to get out of the house to do something and discussed volunteer opportunities with nurse Murphy. (Tr. 1368). On mental status examination, Plaintiff again had appropriate appearance, generally good overall health, "generally relaxed and engaged, cooperative" behavior and manner, restricted affect, her reported mood was sad, depressive thought content, appropriate insight/judgment, grossly intact memory, and average intellect. (Tr. 1369; Exh. 15F:21). Nurse Murphy noted that Plaintiff had "[n]o overt symptoms of anxiety" and "doesn't take medication[.]" *Id*. Plaintiff continued to enjoy caring for her

adopted niece. *Id*. Her medications continued unchanged except for continued cross titration of Lexapro for Effexor. (Tr. 1370).

On July 3, 2019, Plaintiff was seen after missing her previous appointment. (Tr. 1451). Plaintiff rated her depression the same, a 7 out of 10. *Id*. Plaintiff's biggest stressor was financial concern. *Id*. She stated her anxiety fluctuates but "right now I'm Ok." *Id*. On mental status examination, Plaintiff again had appropriate appearance, generally good overall health, "generally relaxed and engaged, cooperative" behavior and manner, restricted affect, her reported mood was sad, depressive thought content, appropriate insight/judgment, grossly intact memory, and average intellect. (Tr. 1452; Exh. B18F:12). Nurse Murphy diagnosed moderate episode of major depressive disorder and generalized anxiety disorder. (Tr. 1452-1453). Her medications were continued except for an increase in Effexor. (Tr. 1453).

**2.  Medical Opinions Concerning Plaintiff's Functional Limitations**

On August 9, 2018, Plaintiff underwent an evaluation performed by psychologist Natalie M. Whitlow, Ph.D. (Tr. 878-887). Dr. Whitlow noted that Plaintiff presented with "mild signs of depression … as well as mild signs of anxiety." (Tr. 881-882). Plaintiff was disheveled in appearance, maintained generally appropriate eye contact, she was alert and attentive, and was coherent in her communication. (Tr. 882-883). Although Plaintiff reported having been diagnosed with depression, she "denied she experienced any mood-related symptoms that are so severe they impair her ability to work." (Tr. 883). Also, though she reported having anxiety symptoms in her daily life, she "denied that they are outside of the normative range of functioning or threaten to impair her working ability." *Id*. Plaintiff was oriented x 4, she possessed average cognitive functioning, and she had fair insight and judgment. (Tr. 884). Dr. Whitlow concluded that Plaintiff did not appear to have limitation in understanding,

9

remembering, and carrying out instructions; maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks; responding appropriately to supervision and coworkers; or responding appropriately to work pressures. (Tr. 886).

On August 14, 2018, State Agency psychologist Kristen Haskins, Psy.D. opined that Plaintiff had moderate limitations in understanding, remembering, or applying information; moderate limitation is interacting with others; moderate limitation in concentration, persistence, or maintaining pace; and moderate limitation in adapting or managing oneself. (Tr. 113). The psychiatric review technique (PRT) given was "an adoption of the ALJ PRT dated 11/20/17" and was "adopted under AR 98-4 (Drummond Ruling)." *Id*.

On October 17, 2018, State Agency psychologist Janet Souder, Psy.D., agreed with Dr. Haskins's opinion. (Tr. 145-46, 150). Dr. Souder also adopted the mental RFC from the ALJ's decision from November of 2017 pursuant to AR 98-4. (Tr. 150). Specifically, Plaintiff could perform simple, routine tasks consistent with unskilled work, with no fast pace or high production quotas and with infrequent change. *Id*. Further, Plaintiff should have superficial interaction with others, with superficial meaning of a short duration for a specific purpose. *Id*. Plaintiff could perform low stress work, meaning no arbitration, negotiation, responsibility for the safety or others, or supervisory responsibility. *Id*.

On October 18, 2018, State Agency physician Stephen Sutherland, M.D. opined that new and material evidence showed a worsening in Plaintiff's physical impairments. (Tr. 150). Dr. Sutherland limited Plaintiff to lifting/carrying 20 pounds occasionally and 10 pounds frequently; sitting and standing/walking for 6 hours each in an 8-hour workday; occasional stooping, kneeling, crouching, crawling, and use of ramps/stairs; could never climb ladders, ropes, or

scaffolds; and limited to occasional reaching overhead with the left upper extremity. (Tr. 148-149). Finally, with respect to environmental limitations, he opined Plaintiff must avoid concentrated exposure to extreme cold, extreme heat, and humidity, as well as avoiding all exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 149-150). She also had to avoid all exposure to hazards. (Tr. 150).

On February 6, 2019, Erin Murphy, CNP completed a checkbox-style Medical Source Statement concerning Plaintiff's mental capacity in which she opined that Plaintiff had marked limitations in the following areas: identifying and solving problems; sequencing multi-step activities; handling conflicts with others; responding to requests, suggestions, criticism, corrections, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. (Tr. 1347). She further assessed marked limitation in Plaintiff's ability to ignore or avoid distractions while working; sustain an ordinary routine and regular attendance at work; work a full day without needing more than the allotted number or length of rest periods during the day; and responding to demands. (Tr. 1348). She had an extreme limitation in adapting to changes. *Id*. Nurse Murphy also assessed mild to moderate limitations in several other categories. (Tr. 1347-1348). The sole explanation for the limitations assessed is the following statement: "Major depressive D/O + Generalized anxiety D/O. Clt's depression has been resistant to medication causing lower threshold for stressors, problems [with] moderate [illegibile] energy. Anxiety affects ability to communicate + endure stressors for long period of time." (Tr. 1348). Nurse Murphy's treatment notes this same date indicate that "Mental Capacity completed with [claimant] and faxed to [Plaintiff's attorney]." (Tr. 1354).

On August 20, 2019, nurse Murphy again completed a checkbox-style Medical Source Statement concerning Plaintiff's mental capacity. Previously identified marked limitations in

identifying and solving problems and sequencing multi-step activities were now reduced to moderate and mild limitations respectively. (Tr. 1470). Plaintiff continued to have marked limitations in the following areas: handling conflicts with others; responding to requests, suggestions, criticism, correction, and challenges; keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; and sustaining an ordinary routine and regular attendance at work. (Tr. 1470-1471). In addition, Plaintiff *no longer* had marked limitations in her ability to ignore or avoid distractions while working; work a full day without needing more than the allotted number or length of rest periods during the day; and responding to demands—the last improving to no limitations. (Tr. 1471). Her previously assessed extreme limitation in adapting to changes had improved to only moderate limitation. *Id*. The sole explanation for the limitations assessed is the following statement: "Major depressive disorder; Generalized Anxiety Disorder. Lanisa struggles [with] constant depressive symptoms that affect energy, motivation + sleep, affecting executive functioning. She also struggles [with] anxiety, which exacerbates affects ability to communicate + interact [with] environments." *Id*. The questionnaire was signed nine days later by Cerny Suelzer, M.D. *Id*.

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2020.

2. The claimant has not engaged in substantial gainful activity since March 25, 2015, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.    The claimant has the following severe impairments: obesity, chronic obstructive pulmonary disease (COPD)/asthma, peripheral neuropathy, osteoarthritis and allied disorders, degenerative disc disease, insulin dependent diabetes mellitus, depressive disorder, and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift 20 pounds occasionally and 10 pounds frequently. She can stand, sit, and walk about 6 hours each in an 8-hour workday. She can push/pull with foot pedals frequently bilaterally. She can occasionally use a ramp or a stairs. She can never use a ladder, rope, or scaffold. She can frequently balance, and occasionally stoop, kneel, crouch, or crawl. She can occasionally reach with the left upper extremity and constantly with the right. She can frequently use her left upper extremity in other planes, and can constantly use the right upper extremity in other planes. She can constantly handle, finger, and feel bilaterally. She must avoid high concentrations of heat, cold, humidity, smoke, fumes, and pollutants. She must entirely avoid dangerous machinery and unprotected heights. She can perform simple routine tasks, but not more complex tasks. She can perform low stress task defined as no piece rate work and no high production quotas. She can have occasional and superficial interactions with coworkers and the public. Superficial is defined as no arbitration, confrontation, or commercial driving.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on ***, 1970 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the

claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from March 25, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18, 21, 28-30).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id*. However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned

even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.  Plaintiff's Assignments of Error**

**1. RFC Finding**

Plaintiff asserts the ALJ erred by not including further limitations in the RFC, as it is her position that substantial evidence would have supported limitations to only two hours of standing/walking and only occasional lifting with the left upper extremity.[4] (R. 14, PageID# 1577-1580). The Commissioner counters that the ALJ properly discharged his responsibility of evaluating the relevant evidence when assessing Plaintiff's RFC. (R. 16, PageID# 1602).

First, the court notes that Plaintiff's argument would require this court to stray from its proper course of inquiry. With respect to the RFC, the court can only remand if it finds the finding was not supported by substantial evidence. It is immaterial whether substantial evidence also could have supported the inclusion of greater or additional limitations. "[T]he substantial evidence standard 'presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Williamson v. Apfel*, 166 F.3d 1216 (6th Cir. 1998) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). In *Isaac v. Secretary of Health & Human Services*, the Sixth Circuit Court of Appeals observed that a plaintiff pointing to reports of various treatment records and contending that such reports constitute substantial evidence of disability "obviously ignores the standard of review by which we are bound. If substantial evidence supports the ALJ's findings, we must

---

[4] At the hearing, the VE testified that an individual with the additional limitations of being able to stand/walk for only two hours in an eight-hour workday and also limited to only occasional handling/fingering with the left upper extremity and frequent handling with the right would be unemployable. (Tr. 82).

affirm the resulting conclusion, even if we would have decided the matter differently in the first instance." 110 F.3d 64, 1997 WL 159323 at *4 (6th Cir. 1997).

Plaintiff's brief herein largely points to other pieces of evidence that she believes the ALJ should have weighed more heavily or offers a different interpretation of the evidence of record than the ALJ. However, simply because substantial evidence could have supported a more restrictive RFC does not provide a basis for remand, as it is immaterial whether there is evidence of record capable of supporting the opposite conclusion. A reviewing court, like this one, does not conduct a *de novo* review, resolve conflicts in the evidence, or decide questions of credibility. *Nelson v. Comm'r of Soc. Sec.*, 195 Fed. App'x 462, 468 (6th Cir. 2006); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Rogers v. Astrue*, 2012 U.S. Dist. LEXIS 24712, 2012 WL 639473 (E.D. Ky. Feb. 27, 2012).

Plaintiff cites numerous portions of the medical record that she believes could (and should) have warranted greater physical limitations. This court, however, cannot interpret the diagnostic findings of x-rays or infer limitations based solely on review of treatment notes. For example, Plaintiff points to diagnoses of osteoarthritis of the knees and hands, which she believes would support greater restrictions with her hands and with standing/walking. However, Plaintiff has not pointed to any opinions from medical sources suggesting that her impairments or corresponding symptoms would necessitate the same limitations Plaintiff now believes should have been included. References to objective tests underpinning the diagnoses, without more, does not establish that any specific standing/walking or manipulation limitations were thereby automatically warranted. To be sure, the ALJ did designate "osteoarthritis and allied disorders" as severe impairments. (Tr. 18). However, even where an impairment is designated severe, it is not necessarily debilitating. A diagnosis alone is of little consequence, as it is well established

that a diagnosis does not indicate the functional limitations caused by an impairment. *See Young v. Sec'y of Health & Human Servs.,* 925 F.2d 146, 151 (6th Cir. 1990) (diagnosis of impairment does not indicate severity of impairment); *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 806 (6th Cir. 2008) ("a diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits").

This is also not a case where an ALJ invented his or her own RFC by interpreting raw medical data to arrive at the limitations contained in the RFC. Rather, the ALJ considered the State Agency medical opinion of Dr. Sutherland, who opined Plaintiff could stand/walk six hours in an eight-hour workday and had no manipulative limitations except for a limitation to only occasional overhead reaching with the left upper extremity and found this opinion persuasive. (Tr. 27, 149-150). The RFC specifically included these limitations. (Tr. 21). State Agency opinions may constitute substantial evidence supporting an ALJ's decision. *See, e.g., Lemke v. Comm'r of Soc. Sec.*, 380 Fed. App'x. 599, 601 (9th Cir. 2010) (finding that the ALJ's decision was supported by substantial evidence where it was consistent with the opinion of the state agency's evaluating psychological consultant, which was consistent with the other medical evidence in the record); *Filus v. Astrue*, 694 F.3d 863 (7th Cir. 2012) (finding that state agency physicians' opinions that a claimant did not meet or medically equal any listed impairment constituted substantial evidence supporting the ALJ's conclusion); *Cantrell v. Astrue*, 2012 WL 6725877, at *7 (E.D. Tenn. Nov. 5, 2012) (finding that the state agency physicians' reports provided substantial evidence to support the ALJ's RFC finding); *Brock v. Astrue*, 2009 WL 1067313, at *6 (E.D. Ky. Apr. 17, 2009) ("[T]he argument that the findings of the two non-examining state agency physicians cannot constitute substantial evidence is inconsistent with the regulatory framework."); *Clark v. Astrue*, 2011 WL 4000872 (N.D. Tex. Sept. 8, 2011) (state

18

agency expert medical opinions "constitute substantial evidence to support the finding that plaintiff can perform a limited range of light work."). Thus, an RFC determination that is based upon the medical opinions of State Agency consultants is generally supported by substantial evidence.[5]

Plaintiff essentially asks the court to look at the medical records, such as x-rays of Plaintiff's knees and hands, or her diagnoses of peripheral neuropathy and osteoarthritis, and decide that Plaintiff should have been limited to only two-hours of standing/walking and occasional handling and feeling with the left hand contrary to the State Agency physician's opinion. (R. 14, PageID# 1579-1580). Again, Plaintiff points to no acceptable medical source who opined such limitations were warranted. In other words, Plaintiff is essentially asking the court to interpret the evidence and assume the role of doctor. The court declines to do so.

Although the standing/walking and manipulative restrictions in this case were founded upon the State Agency physician's opinion, "ALJs are not required obtain medical opinions before starting in on the RFC: the claimant bears responsibility for providing evidence establishing disability." *Charbonneau v. Comm'r of Soc. Sec.*, No. 2:18-CV-10112, 2019 WL 960192, at *16 (E.D. Mich. Jan. 11, 2019), *report and recommendation adopted, 2019 WL 952736 (E.D. Mich. Feb. 27, 2019)* (citing 20 C.F.R. § 404.1512(a)). Courts are generally unqualified to interpret raw medical data and make medical judgments concerning the limitations that may reasonably be expected to accompany such data. *See, e.g., Mascaro v. Colvin*, No. 1:16CV0436, 2016 WL 7383796, at *11 (N.D. Ohio Dec. 1, 2016) (noting neither the ALJ nor

---

[5] Plaintiff's assertion that Dr. Sutherland probably would have changed his opinion had he the benefit of reviewing x-rays that post-date his opinion (R. 14, PageID# 1580) is nothing more than conjecture based on Plaintiff's own lay opinion.

the court had the medical expertise to conclude whether the results of a neurological exam necessarily ruled out the existence of a disabling condition); *Hagan v. Comm'r of Soc. Sec.*, No. 16-14022, 2018 WL 1354472, at *12 (E.D. Mich. Feb. 23, 2018) ("Neither the ALJ nor this Court possesses the medical expertise to interpret the significant medical evidence in the record to determine if plaintiff's impairments, in combination, equal any of the applicable listings."); *Nofsinger v. Comm'r of Soc. Sec.*, No. 1:09-CV-29, 2010 WL 2651600, at *2 (W.D. Mich. July 1, 2010) ("Limitations are the expertise of medical providers and outside the expertise of both this Court and ALJs."); *Talley v. Barnhart*, No. 1:05-00039, 2008 WL 2414841, at *7 (M.D. Tenn. June 12, 2008) ("this Court does not have the medical expertise to say that recurrent sinus infections always necessitate an assessment of environmental limitations"); *Snyder v. Barnhart*, 2005 WL 525258, at *6 (D. Del. Mar. 2, 2005) ("Frankly, this lay court has no idea what conclusions should be drawn from [the] alleged abnormalities [identified in the record by the plaintiff].'); *Mills v. Astrue*, 2011 WL 3841020, at *5 (D.S.C. July 22, 2011) ("the plaintiff cannot, over and over, baldly claim limitations that medical expertise has not corroborated"), *report and recommendation adopted*, 2011 WL 3840989 (D.S.C. Aug. 26, 2011); *Prince v. Sullivan*, 1990 U.S. Dist. LEXIS 1422, at *19 (N.D. Ill. Feb. 7, 1990) ("This court lacks the medical expertise to assess what impact plaintiff's heart problems have on his medical condition.")

For the foregoing reasons, the first assignment of error is without merit.

**2. Weight Assigned to Nurse Murphy and Dr. Suelzer's Opinions**

In the second assignment of error, Plaintiff argues the ALJ's determination—that the opinions of nurse Murphy and Dr. Suelzer were not persuasive—was erroneous. Plaintiff asserts there was "strong medical evidence in support" of those opinions. (R. 14, PageID# 1580).

Plaintiff applied for social security benefits on June 1, 2018. (Tr. 265-276). Therefore, the former "treating physician rule" no longer applies, as it was eliminated by a change in social security regulations applicable to all claims filed after March 27, 2017. Indeed, the regulations no longer use the term "treating source," instead utilizing the phrase "your medical source(s)." 20 C.F.R. § 416.920c. Moreover, the change is not merely semantic, as the regulation explicitly states that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including those from your medical sources."[6] *Id.* As explained by the SSA, "[c]ourts reviewing claims under [the old] rules … focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decision…. [T]hese courts, in reviewing final agency decisions, are reweighing evidence instead of applying the substantial evidence standard of review, which is intended to be highly deferential standard to us." *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844-01, 2017 WL 168819 (Jan. 18, 2017).

With respect to the two opinions[7] of nurse Murphy and the cosigned opinion of Dr. Suelzer, the ALJ found as follows:

On February 6, 2019, Erin Murphy, CNP completed a questionnaire in which she

---

[6]  "Prior administrative findings" refers to the findings of the State Agency physicians or psychologists. 20 C.F.R. § 416.913(a)(5) While the new regulations differentiate between "medical opinions" and "prior administrative medical findings," the regulations do not ascribe greater significance to either, and both and are evaluated utilizing the same factors. 20 C.F.R. § 416.920c(c).

[7]  Pursuant to 20 C.F.R. § 416.920c(b)(1), "when a medical source provides multiple medical opinion(s) …, we will articulate how we considered the medical opinions … from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are *not* required to articulate how we considered *each* medical opinion … from one medical source individually." (emphasis added).

opined that the claimant had marked limitations in the following: identifying and solving problems, sequencing multi-step activities, handling conflicts with others, responding to requests, suggestions, criticism, corrections, and challenges, and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness (Exhibit B14F:3). She also had marked limitation in ignoring or avoiding distractions while working, sustain an ordinary routine and regular attendance at work, work a full day without needing more than the allotted number or length of rest periods during the day, and responding to demands (Exhibit B14F:4). She had an extreme limitation in adapting to changes. She also had mild to moderate limitations in several categories (Exhibit B14). Ms. Murphy stated that the claimant's depression was resistant to medication and caused a lower threshold for stressors and problems. Her anxiety affected her ability to communicate and endure stressors for long periods of time (Exhibit B14R/4).

On August 20, 2019, Erin Murphy CNP competed a questionnaire that was co-signed by Cerny Suelzer, M.D. nine days later. In the questionnaire, they opined that the claimant…had marked limitations in the following categories: handles conflicts with others, responds to requests, suggestions, criticism, correction, and challenges, keeps social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness, and sustaining an ordinary routine and regular attendance at work (Exhibit B20F:2, 3). She rated that the claimant had moderate limitation in identifying and solving problems, cooperating with others, ignoring or avoiding distractions while working, changing activities or work settings without being disruptive, working closely to or with other without interrupting or distracting them, working a full day without needing more than the allotted number of length of rest periods during the day, adapting to changes, managing one's psychologically based symptoms, distinguishing between acceptable and unacceptable work performance, and setting realistic goals. Ms. Murphy stated that the claimant's major depressive disorder and generalized anxiety symptoms affected her energy, motivation, sleep, and executive functioning.

Ms. Murphy provided medication management to the claimant and treated her for a period of approximately three years. Dr. Suelzer appeared to be Ms. Murphy's supervisory physician, but there was no indication that she personally examined the claimant.[8] Their opinions were not persuasive because they were inconsistent with the claimant's own representations that she was enrolling in community

---

[8]  Plaintiff's recitation of the medical record fails to refute in any way the ALJ's conclusion that Dr. Suelzer was merely nurse Murphy's supervisory physician, and her brief cites no evidence that Dr. Suelzer ever personally examined the claimant. (Br. 14). Therefore, the court construes this as the opinion of nurse Murphy only. However, the revised regulations designate a "Licensed Advanced Practice Registered Nurse" as an "acceptable medical source" for claims filed on or after March 27, 2017. *See* 20 C.F.R. §§ 404.1502(a)(7) & 416.902(a)(7).

college to study early childhood development (Exhibit B15F:20). She was raising
a special needs child since she was a newborn and she subsequently adopted by
her testimony (Exhibit B18F:14). She also stated that she frequently babysat her
grandchildren, which indicates that her mental functioning was better than Ms.
Murphy and Dr. Suelzer opined (Exhibit B18F:14). Further, Ms. Murphy's own
medical records state that examination showed that she was generally relaxed and
engaged as well as cooperative (Exhibit B15F:6). Her affect was restricted. Her
mood was sad.

(Tr. 27-28).

Nevertheless, the new regulations are not devoid of any requirements as it relates to an

ALJ's duty to explain the weight assigned to medical opinions such as those of nurse Murphy.

An ALJ is required to articulate how he or she considered the factors of "supportability" and

"consistency," which are the two "most important factors" in determining the persuasiveness of a

medical source's medical opinion or a prior administrative medical finding. 20 C.F.R. §

416.920c(b) & (c). "The factors of supportability … and consistency … are the most important

factors we consider when we determine how persuasive we find a medical source's medical

opinions or prior administrative medical findings to be." 20 C.F.R. § 416.920c(b)(2). "We may,

but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5)

of this section, as appropriate, when we articulate how we consider medical opinions and prior

administrative medical findings in your case record." *Id*.

Plaintiff takes issue with the "one examination in which … Ms. Alexander was relaxed

and engaged and was cooperative," and alleges ALJ failed to consider other medical records in

the file where she was routinely diagnosed with generalized anxiety disorder and recurrent major

depressive disorder. (R. 14, PageID# 1582-1583). As stated above, a diagnosis alone is of little

value because it does not indicate the functional limitations caused by said impairment. *See*

*Young,* 925 F.2d at 151. While Plaintiff's brief gives the impression that the ALJ cherry-picked

an isolated treatment note as a basis for finding nurse Murphy's opinion was inconsistent, the ALJ explicitly stated that nurse Murphy's own medical *records* (plural) showed that she was generally engaged, relaxed, and cooperative. (Tr. 28). While it is true the decision cites only one such record specifically, as set forth in the recitation of the evidence above, nurse Murphy makes the observation that Plaintiff is generally engaged, relaxed, and cooperative during *five* separate mental status examinations between December of 2018 and July of 2019. (Tr. 1351, 1354, 1360, 1369, 1452). Plaintiff also points to her own statements made to nurse Murphy that she was isolating, had poor motivation, and felt frustrated and overwhelmed.[9] (R. 14, PageID# 1582-1583). Her own statements to a medical provider, however, do not in any way negate or undermine the ALJ's analysis.

The ALJ determined that nurse Murphy's opinions were not consistent with her own treatment notes or with the overall evidence of record. (Tr. 28). The ALJ appears to have

---

[9] Plaintiff's statements made to medical sources or to an occupational therapist are not *per se* credible, nor are they transformed into "medical opinions" simply because the patient's statements have been recorded in treatment notes. *See, e.g., Francis v. Comm'r of Soc. Sec.*, 414 Fed. App'x 802, 804 (6th Cir. 2011) (the physician's statement "is not a 'medical opinion' at all—it merely regurgitates [the patient's] self-described symptoms"); *accord Paddock v. Comm'r of Soc. Sec.*, No. 1:11-cv-7, 2012 U.S. Dist. LEXIS 135860, 2012 WL 4356711 (W.D. Mich. Sept. 24, 2012); *see also Boughner v. Comm'r of Soc. Sec.*, No. 4:16-CV-1858, 2017 U.S. Dist. LEXIS 89060, 2017 WL 2539839, at *8 (N.D. Ohio May 22, 2017), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 89061, 2017 WL 2501073 (N.D. Ohio June 9, 2017) (finding that medical records containing observations recorded by a claimant's physician were likely statements made by plaintiff about his condition and not medical opinions as defined by the regulations); *Coleman v. Comm'r of Soc. Sec. Admin.*, No. 1:16-CV-0179, 2016 U.S. Dist. LEXIS 184079, 2016 WL 8257677, at *14 (N.D. Ohio Nov. 29, 2016), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 21835, 2017 WL 633423 (N.D. Ohio Feb. 15, 2017) (finding that "office notes reflect plaintiff's own subjective statements regarding her condition" and, therefore, do not constitute "objective medical evidence"); *Rogers v. Astrue*, No. 11-cv-82, 2012 U.S. Dist. LEXIS 24712, 2012 WL 639473, at *4 (E.D. Ky. Feb. 27, 2012) ("Simply recording Plaintiff's subjective complaints is not objective medical data therefore Dr. Lyons' clinical findings were insufficient to support a deferential review by the ALJ.")

combined the supportability and consistency factors in his analysis, though explicitly only mentions consistency. The revised regulations, when explaining what is meant by "consistency," explicitly instruct an ALJ to consider "evidence from *other* medical sources and nonmedical sources in the claim." 20 C.F.R. §§ 404.1520c(c)(2) & 416.920c(c)(2) (emphasis added). The ALJ's identification of Plaintiff's activities that are inconsistent with nurse Murphy's opinions goes to the very heart of consistency, as her statements are evidence from other nonmedical sources. In addition, the ALJ found the opinions of State Agency psychological consultants Dr. Souder and Dr. Haskins "persuasive because they were supported by and consistent with the evidence." (Tr. 27). The regulations state that evidence[10] from *other* medical sources, in this case State Agency psychologists, is also pertinent in the consideration of whether nurse Murphy's opinion is consistent. Thus, the decision as a whole sufficiently explains why nurse Murphy's opinions were found to be lacking in consistency.

It is true that the ALJ does not expressly appear to separately address the "supportability" factor, which is among the two most important factors. The ALJ does, however, identify perceived inconsistencies between nurse Murphy's opinions and her own treatment records. (Tr. 28). The court concedes it is not entirely clear whether a medical opinion provider's own treatment records impact the supportability factor, the consistency factor, or both. While a reasonable lay interpretation may suggest consistency is the relevant factor when discussing a medical opinion provider's own treatment records, the regulations discuss consistency in terms

---

[10]  Medical evidence—for claims filed after March 27, 2017—includes both "objective medical evidence" as well as "evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. §§ 404.1513(a)(3) & 416.913(a)(3).

of evidence from *other* medical sources—not the *same* source. § 406.920c(c)(2). On the other hand, the regulations state that "supportability," which is defined as "[t]he more relevant the *objective medical evidence and supporting explanations **presented by** a medical source* are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1) (emphasis added). In that case, depending on their content, it may be appropriate to consider a medical opinion provider's own treatment notes under the "supportability" factor. In any event, it is clear that the ALJ found nurse Murphy's observations during mental status examinations were at odds with the extent of the limitations she set forth in the checkbox questionnaires.

The court finds the ALJ sufficiently complied with the regulations that instructs ALJs how to consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017. Plaintiff's brief suggests that "[r]emand is appropriate for the ALJ to find these opinions [of nurse Murphy] are more persuasive." (R. 14, PageID# 1583). Such an argument inappropriately invites this court to reweigh the medical opinions of record and come to its own decision. *See, e.g.*, *Hunter v. Comm'r of Soc. Sec.*, No. 3:19 CV 1977, 2021 U.S. Dist. LEXIS 1112, at *6-7 (N.D. Ohio Jan. 5, 2021)* ("In his objection to the R&R, Plaintiff argues the ALJ proffered an inaccurate RFC, in part, because she improperly analyzed the opinions of Drs. Lakin and Hammerly …. In essence, Plaintiff asked Judge Ruiz (and asks this Court) to re-analyze medical opinions and re-weigh evidence. However, it is well settled that this Court cannot and will not re-weigh evidence; in these cases, the Court exists solely to determine whether the ALJ's findings, on initial review, are supported by substantial evidence.") (Knepp, J.) (citing *Wright v. Massanari*, 321 F.3d 611, 614-15 (6th Cir. 2003)).

Plaintiff's second assignment of error, therefore, is without merit.

**3. Pain Analysis**

In the third assignment of error, Plaintiff asserts the ALJ erred by failing to perform a proper pain analysis. (R. 14, PageID# 1584-1586). The Commissioner contends the ALJ properly evaluated the credibility of Plaintiff's subjective complaints of disabling pain and other symptoms and resulting limitations. (R. 16, PageID# 1609-1611). When a claimant alleges disability based on her subjective complaints, she must present objective medical evidence of an underlying medical condition.

Although "subjective complaints of pain may support a claim for disability," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6ᵗʰ Cir. 2007), "[s]ubjective complaints of pain or other symptoms shall not alone be conclusive evidence of disability." *Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 806 (6ᵗʰ Cir. 2008) (quoting *Arnett v. Comm'r of Soc. Sec.*, 76 Fed. App'x 713, 716 (6ᵗʰ Cir. 2003)); *accord Gist v. Saul*, No. 19-13169, 2021 U.S. Dist. LEXIS 59308, at *21, 2021 WL 1169748 (E.D. Mich. Mar. 29, 2021). Plaintiff's challenge, however, appears to take issue with the ALJ's credibility analysis and alleged non-compliance with SSR 16-3p. (R. 14, PageID# 1584-1585).

"[C]redibility determinations with respect to subjective complaints of pain rest with the ALJ." *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6ᵗʰ Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6ᵗʰ Cir. 1987). An ALJ is not required to accept a claimant's subjective complaints. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6ᵗʰ Cir. 2003); *accord Sorrell v. Comm'r of Soc. Sec.*, 656 Fed. App'x 162, 173 (6ᵗʰ Cir. 2016). The *Villarreal* court noted "tolerance of pain is a highly individual matter and a determination of disability based on pain by necessity depends largely on the credibility of the claimant," and an

ALJ's credibility finding "should not lightly be discarded." *Villarreal*, 818 F.2d at 463 (citations omitted). Nevertheless, while an ALJ's credibility determinations concerning a claimant's subjective complaints are left to his or her sound discretion, those determinations must be reasonable and supported by evidence in the case record. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983) ("the ALJ must cite *some* other evidence for denying a claim for pain in addition to personal observation").

The Social Security Administration has stated "[i]n evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304 at *10 (Oct. 25, 2017). Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. A reviewing court should not disturb an ALJ's credibility determination "absent [a] compelling reason," *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and "in practice ALJ credibility findings have become essentially 'unchallengeable.'" *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 476 (6th Cir. 2016) (*citing Payne v. Comm'r of Soc. Sec.*, 402 Fed. App'x 109, 113 (6th Cir. 2010)).

According to SSR 16-3p, evaluating an individual's alleged symptoms entails a two-step process that involves first deciding whether a claimant has an "underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an

individual's symptoms, such as pain."[11] 2017 WL 5180304 at *2-3. The ALJ's decision found

the first step was satisfied and states that Plaintiff's medically determinable impairments "could

reasonably be expected to cause the alleged symptoms…." (Tr. 22).

     After step one is satisfied, an ALJ should consider the intensity, persistence, and limiting

effects of an individual's symptoms. The ALJ concluded that Plaintiff's statements concerning

the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with

the medical evidence and other evidence in the record for the reasons explained in this decision."

(Tr. 22). The ALJ discussed Plaintiff's alleged functional limitations in the following discussion:

> The claimant alleged an inability to perform full-time work due to scoliosis,
> fibromyalgia, diabetes, depression, anxiety, and fibroid tumors (Exhibit B3A:2).
>
> In her Function Report, the claimant stated that she spent her day taking care of
> her one-year-old baby and watching television (Exhibit B4E/2). She also made
> dinner. She stated that she cared for her husband and daughter. She reported pain
> in her back and knees. She took her time with her personal care or her older
> children helped her.
>
> At the hearing, the claimant testified that she had problems with arthritis in her
> knees and hands that prevented her from standing for long times. She said she had
> trouble getting moving in the morning. She did bathe the two year old and cooked
> meals.
>
> After careful consideration of the evidence, I find that the claimant's medically
> determinable impairments could reasonably be expected to cause the alleged
> symptoms; however, the claimant's statements concerning the intensity,

---

[11] "The Sixth Circuit characterized SSR 16-3p … as merely eliminating 'the use of the word
credibility . . . to clarify that the subjective symptoms evaluation is not an examination of an
individual's character.'" *Butler v. Comm'r of Soc. Sec.*, No. 5:16cv2998, 2018 WL 1377856, at
*12 (N.D. Ohio, Mar. 19, 2018) (Knepp, M.J.) (*quoting Dooley v. Comm'r of Soc. Sec.*, 656 Fed.
App'x 113, 119 n.1 (6th Cir. 2016)). Like several other courts, this court finds little substantive
change between the two social security rulings, and the changes largely reflect a preference for a
different terminology. *See, e.g., Howard v. Berryhill*, No. 3:16-CV-318-BN, 2017 WL 551666,
at *7 (N.D. Tex. Feb. 10, 2017) ("having reviewed the old and new rulings, it is evident that the
change brought about by SSR 16-3p was mostly semantic."). While the court applies the current
SSR, it declines to engage in verbal gymnastics to avoid the term credibility where usage of that
term is most logical.

persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because the evidence failed to show that the claimant was as limited as she alleged. The evidence showed that she was capable of less than a full range of light work. The claimant was enrolling in community college to study early childhood development (Exhibit B15F:20). She was raising a special needs child since she was a newborn and she subsequently adopted by her testimony (Exhibit B18F:14). She also stated that she frequently babysat her grandchildren, indicating better mental functioning than alleged (B18F:14). Further, Ms. Murphy's own medical records state that examination showed that she was generally relaxed and engaged as well as cooperative (Exhibit B15F:6). Her affect was restricted. Her mood was sad. Examination showed tenderness over the 1st CMC joints of the thumbs and she had painful range of motion with crepitus in the knees (Exhibit B17/20). Her gait was normal and her reflexes were normal and symmetric. Dr. Chatterjee stated that the claimant had osteoarthritis in the hands and knees and lumbar degenerative disc disease, but no evidence of rheumatoid arthritis or other connective tissue disease (Exhibit B17F:20). She took insulin and metformin for her diabetes mellitus. X-rays of the claimant's knees show moderate to severe medial joint space (Exhibit B17F:34). X-rays showed multifocal osteoarthritis of the left hand, moderate to severe in degree at the CMC joints and right hand mild osteoarthritis (Exhibit B17F:35). Therefore, the claimant could perform less than a full range of light work, consistent with the above residual functional capacity findings.

(Tr. 22-23).

Plaintiff asserts the ALJ failed to take into account all the factors that were required of him to properly assess Plaintiff's pain, such as its location, duration, frequency, and intensity. (R. 14, PageID# 1585). Plaintiff then proceeds to cite her own subjective statements to Dr. Smith as evidence corroborating her alleged limitations in activities of daily living. *Id*. at PageID# 1585-1586.

Plaintiff's argument—that her alleged symptoms are corroborated by her own statements made to medical professionals concerning her symptoms—amounts to circular reasoning. Furthermore, there is ample case law rejecting such questionable logic. Plaintiff's statements

made to medical sources or to an occupational therapist are not *per se* credible, nor are they transformed into "medical opinions" simply because the patient's statements have been recorded in treatment notes. *See* note 9, *supra* (gathering case law concluding that physician's records, observations and statements are not medical opinions when they merely reflect claimant's subjective statements).

At the second step of the symptoms analysis, when considering the intensity, persistence, and limiting effects of an individual's symptoms, an ALJ should consider the following seven factors: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and, (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p at *4-8 (same factors as in SSR 96-7p).

The ALJ discussed several of the seven factors set forth in SSR 16-3p for finding Plaintiff less than fully credible. These included Plaintiff's daily activities, such as caring for her husband, daughter, and adopted baby as set forth in the quote above. While the decision could have benefited from a more unified analysis of Plaintiff's credibility symptoms, the court looks to the decision as a whole. The ALJ made some references to her pain treatment for her extremities, noting that Plaintiff was on insulin to control her diabetes mellitus (Tr. 23, 25), and that Plaintiff had tried to alleviate her pain with Motrin, which was not effective. (Tr. 24). Admittedly, the ALJ could have further discussed the various other modes of treatment, or lack thereof, for

Plaintiff's pain. However, "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989); *accord Kobetic v. Comm'r of Soc. Sec.*, 114 Fed. App'x 171, 173 (6th Cir. 2004) ("When 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.'") (*quoting NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)); *Mabrey v. Comm'r of Soc. Sec.*, 1:13-cv-555, 2015 WL 556435 at *5 (S.D. Ohio Feb. 10, 2015), *adopted by* 2015 WL 1412205 (Mar. 26, 2015).

In addition, as far as "other factors," the ALJ acknowledged the objective tests of record that could cause pain, but pointed to the frequent examinations and repeated notations where Plaintiff had a normal gait, full range of motion, 5/5 muscle strength, and normal reflexes. (Tr. 23-25).

Though greater discussion is always preferred, an ALJ is not required to analyze all seven factors but should consider the relevant evidence. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) (Baughman, M.J.) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence"); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005) (finding that neither SSR 96-7p nor the regulations "require the ALJ to analyze and elaborate on each of the seven factors when making a credibility determination"); *Wolfe v. Colvin*, No. 4:15-CV-01819, 2016 WL 2736179, at *10 (N.D. Ohio May 11, 2016) (Vecchiarelli, M.J.); *Allen v. Astrue*, No. 5:11CV1095, 2012 WL 1142480, at *9 (N.D. Ohio Apr. 4, 2012) (White, M.J.). SSR 16-3p itself states that where "there is no information in the evidence of record regarding one of the factors, we will not discuss that specific factor," but

rather will only "discuss the factors pertinent to the evidence of record." *Id*. at *8.

Given the high level of deference owed to an ALJ's findings with respect to the evaluation of a claimant's alleged symptoms and resulting limitations, under the circumstances presented herein, the court does not find the ALJ's credibility analysis was insufficient. Thus, Plaintiff's final assignment of error is without merit.

## VI. Conclusion

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

IT IS SO ORDERED.

s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: September 29, 2021